State of NEW JERSEY AND ITS
DIVISION OF INVESTMENT
et al., Plaintiffs,

v.

SPRINT CORPORATION; William T. Esrey; Ronald T. LeMay; Harold S. Hook; Charles E. Rice; Louis W. Smith; Linda Koch Lorimer; Stewart Turley; DuBose Ausley; Warren L. Batts; Irvine O. Hockaday, Jr.; Arthur Krause; J.P. Meyer; and Ernst & Young LLP, Defendants.

No. 03–2071–JWL.

United States District Court,
D. Kansas.

April 23, 2004.

Allyn Z. Lite, Bruce D. Greenberg, Joseph J. DePalma, Mary Jean Pizza, Lite, DePalma, Greenberg & Rivas LLC, Newark, NJ, Christopher L. Nelson, Jacob A. Goldberg, Richard S. Schiffrin, Schiffrin & Barroway LLC, Bala Cynwyd, PA, Linda C. McFee, Thomas R. Buchanan, McDowell, Rice, Smith & Gaar, PC, Kansas City, MO, for Plaintiffs.

James M. Webster, III, Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Ev-

ans, Washington, DC, Charles W. German, David J. Rempel, Rouse Hendricks German May PC, Clayton L. Barker, Mark A. Thornhill, Spencer Fane Britt & Browne, Kansas City, MO, David N. Greenwald, Francis P. Barron, Michael A. Paskin, Ronald S. Rolfe, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiffs filed this proposed class action suit on behalf of persons who purchased Sprint securities between October 17, 2000 and February 5, 2003 (the "class period") and on behalf of persons who purchased Sprint "equity units" traceable to an August 7, 2001 registration statement during the class period. In their first amended complaint, plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (fraud in connection with the sale of securities) violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and the SEC's Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9 (proxy statement misrepresentations); and violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (sale of securities through misleading registration statement). Plaintiffs also assert against the individual defendants claims under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, which impose secondary liability upon persons who control persons primarily liable for violations of Section 10(b) and Rule 10b–5, and Section 11, respectively.

This matter is presently before the court on defendant Sprint Corporation and the

individual defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (doc. # 68) and defendant Ernst & Young LLP's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (doc. # 70). Oral arguments were heard on the motions on April 1, 2004. After a thorough review of the written submissions by the parties and careful consideration of the arguments made by all parties during oral argument as well as the relevant legal authorities, the court grants in part and denies in part the Sprint defendants' motion to dismiss and grants Ernst & Young's motion to dismiss in its entirety.

### I. Background

The following facts are taken from plaintiffs' first amended complaint and, for purposes of analyzing defendants' motions to dismiss, the court assumes the truth of these facts. *See infra* part II.[1] Defendant Sprint Corporation is a global communications company that provides local, long distance and wireless services. During the Class Period, Sprint's common stock was actively traded on the New York Stock Exchange. As a public company, Sprint regularly files financial reports with the SEC, including annual and quarterly reports, registration statements and proxy statements. During the Class Period, all financial statements included in these reports were audited by defendant Ernst & Young LLP. Moreover, during the Class Period, defendant William T. Esrey was Sprint's Chairman and Chief Executive Officer; defendant Ronald T. LeMay was its President and Chief Operating Officer; defendant Arthur Krause was Sprint's Executive Vice President and Chief Financial Officer; and defendant J.P. Meyer was

1. To the extent the factual allegations and theories set forth in plaintiffs' first amended complaint differ from those asserted by plaintiffs during oral argument, such differences, to the extent they are significant, will be discussed in the text of this opinion.

Sprint's Senior Vice President and Controller. The remaining individual defendants served on Sprint's Board of Directors during the Class Period.

Like many other publicly traded companies, Sprint paid its executives and certain employees, including Mssrs. Esrey and LeMay, a portion of their compensation in the form of Sprint common stock options. This case arises out of events that occurred after Mssrs. Esrey and LeMay exercised certain options during 1999 and 2000. According to plaintiffs, Mssrs. Esrey and LeMay each exercised options during 1999 and 2000 with a taxable gain of $149 million and $138 million, respectively. As a result of Mssrs. Esrey's and LeMay's option exercises, Sprint derived significant tax benefits in the form of deductions from its taxable income. Plaintiffs do not suggest that the options were improperly granted or exercised or that Sprint acted improperly in taking the resulting tax deductions.

Because the exercise of options results in tax liability on the gain realized thereby, the options exercised by Mssrs. Esrey and LeMay subjected them to significant personal tax liability. According to plaintiffs, Mssrs. Esrey and LeMay would have needed more than $100 million in cash, collectively, to pay the taxes associated with their option exercises. While individuals typically fund such tax liabilities through the sale of some shares, the first amended complaint alleges that Mssrs. Esrey and LeMay elected not to sell any Sprint shares for fear that such an action

(by Sprint's top two executives) would misleadingly signal a lack of confidence in the company and thereby cause a decline in stock price. As an alternative to selling shares, defendant Ernst & Young developed and offered to Mssrs. Esrey and LeMay certain "tax shelters" which either eliminated or greatly reduced Mssrs. Esrey's and LeMay's tax obligations with respect to the gains realized through the option exercises.[2] According to plaintiffs, Sprint mandated that its senior executives use Ernst & Young to prepare their personal tax returns and these executives were reimbursed by Sprint for the cost of the work performed by Ernst & Young. Plaintiffs do not allege, however, that Sprint had any knowledge concerning the substance of any advice that Ernst & Young provided to Mssrs. Esrey and LeMay and plaintiffs do not allege that Sprint had any knowledge that Mssrs. Esrey and LeMay had entered into the transactions offered by Ernst & Young, at least at the time they entered into the transactions.

In September 2000, after Mssrs. Esrey and LeMay had entered into the transactions constituting the tax shelters, the IRS issued Cumulative Bulletin Notice 2000–36, which contained Notice 2000–44. That Notice, in turn, outlined the IRS's position that tax shelters similar to the ones that Ernst & Young sold to Mssrs. Esrey and LeMay were invalid and subject to challenge.[3] The Notice further stated that participants in such transactions may be subjected to appropriate penalties. Ac-

2. While none of the parties describe the nature of the "tax shelters" in any detail, defendants explain that the shelters were "a complex series of swap transactions and currency option trades." According to plaintiffs, the shelters involved a two-part transaction. First, Mssrs. Esrey and LeMay used the options to engage in a swap-based transaction that was designed to turn income from the options exercises into capital gains, which are

taxed at a rate of 20 percent rather than the significantly higher ordinary-income rate of closer to 40 percent. The second part of the transaction, according to plaintiffs, was designed to appear to generate a loss for tax purposes by raising the costs of the assets-the Sprint shares-through the use of partnerships and trades in currency options.

3. Notice 2000–44 did not address the specific transactions entered into by Mssrs. Esrey

cording to plaintiffs, Mssrs. Esrey and LeMay, at this point, knew that there was a high probability that the tax liability they had avoided would become due and the taxes that they owed-more than $100 million collectively-would force them into personal financial ruin.

In late 2000, Mssrs. Esrey and LeMay advised Sprint's Board of Directors about the nature of the transactions they had entered into as well as the IRS's subsequent notice suggesting that the transactions were invalid. Mssrs. Esrey and LeMay asked the Board to consider "unwinding" or rescinding the option exercises, thereby nullifying Mssrs. Esrey's and LeMay's tax liability. After seeking guidance from the SEC regarding whether Sprint could rescind the option exercises, Sprint ultimately rejected the idea because it would have caused Sprint to lose the tax deductions it had taken upon Mssrs. Esrey's and LeMay's option exercises and, thus, would have required Sprint to restate its earnings and refile its tax returns to pay back taxes. The Board of Directors also rejected a request from Mr. Esrey for additional compensation to cover his potential tax liability.

By the end of 2001, Mssrs. Esrey and LeMay had applied for and received tax amnesty from the IRS and thus were immune from any penalties the IRS might have levied if it ultimately concluded that the tax shelters utilized by Mssrs. Esrey and LeMay were invalid. Mssrs. Esrey and LeMay, however, were still liable for any unpaid taxes on the gains realized as a result of their option exercises (again, assuming the IRS ultimately concluded that the shelters were invalid). By this time,

however, Mssrs. Esrey and LeMay could not sell their shares to cover their potential tax liability because Sprint's common stock price had declined dramatically such that Mssrs. Esrey's and LeMay's potential tax liability far exceeded the total value of their Sprint holdings.

During 2002, Sprint's Board of Directors held over twenty meetings dedicated to discussing the tax problems faced by Mssrs. Esrey and LeMay, the potential conflicts those problems created, whether to retain Mssrs. Esrey and LeMay as its two most senior executives and whether to retain Ernst & Young as Sprint's independent auditor. Moreover, in June 2002, the Board learned that the IRS had begun formally investigating Mssrs. Esrey and LeMay in connection with the specific tax shelters utilized by them.[4] At that time, the Board hired the law firm of Davis Polk & Wardwell to assess what action Sprint should take. According to plaintiffs, the Board was worried about the tension between its independent auditor, Ernst & Young, and its top two executives, as well as the prospect that personal financial ruin for Mssrs. Esrey and LeMay might undermine their ability to run Sprint. By October 2002, Davis Polk & Wardwell recommended to the Board the dismissal of Mssrs. Esrey and LeMay in light of the tax shelter problems and the resulting conflict between Mssrs. Esrey and LeMay and Ernst & Young. During this same time frame, the Board hired an executive search firm to begin searching for a new CEO.

In January 2003, the Board reached a final decision concerning the continued service of Mssrs. Esrey and LeMay[5] and

and LeMay; it addressed in general terms transactions similar to the ones used by Mssrs. Esrey and LeMay.

4. The IRS's audit of the tax shelters utilized by Mssrs. Esrey and LeMay is apparently

ongoing and no determination has been made about the validity of those shelters.

5. As will be explained, plaintiffs asserted during oral argument that, at some point prior to January 2003, it became "inevitable" and a

on January 30, 2003, the Wall Street Journal reported that both Mr. Esrey and Mr. LeMay would be leaving Sprint. According to plaintiffs, the Board ultimately rejected the alternative solution of firing Ernst & Young for fear that doing so would provide the IRS with ammunition against Ernst & Young as well as against Mssrs. Esrey and LeMay and might even trigger an SEC probe of Sprint.

In their first amended complaint, plaintiffs assert that portions of Sprint's Form 10–K for 2000 (filed in March 2001) and Sprint's Form 10–K for 2001 (filed in March 2002) as well as a July 26, 2001 registration statement and August 7, 2001 prospectus supplement and two proxy statements filed in March 2001 and March 2002 were false and misleading because those materials failed to disclose a multitude of facts that a reasonable investor would have considered important in making a decision to purchase Sprint securities. Specifically, plaintiffs assert that defendants failed to disclose the following material facts: (1) that the tax advice Ernst & Young sold to Mssrs. Esrey and LeMay allowed them to attempt to avoid paying taxes, through the use of improper tax shelters, on the gains they realized as a result of their option exercises; (2) that the IRS ruled that tax shelters similar to those utilized by Mssrs. Esrey and LeMay were improper, thus exposing Mssrs. Esrey and LeMay to a potential tax liability so significant it would cause Mssrs. Esrey and LeMay personal financial ruin and render their continued service as Sprint's most senior executives in grave doubt; (3) that Sprint had approached the

SEC about whether it could unwind Mssrs. Esrey's and LeMay's option exercises but decided to reject that approach as it would have forced Sprint to restate its earnings; (4) that Mssrs. Esrey and LeMay applied for and received amnesty in connection with the tax shelters they utilized; (5) that during 2002 the Board of Directors had at least twenty meetings devoted to addressing the question of whether to dismiss Mssrs. Esrey & LeMay or whether to dismiss Ernst & Young; and (6) that various material, debilitating conflicts arose between and among Mssrs. Esrey and LeMay, Sprint and its Board of Directors and Ernst & Young as a result of the tax shelter situation.[6]

According to plaintiffs, the investing public had no knowledge of any of these omissions until the Wall Street Journal began breaking the story at the end of January 2003. They further assert that as a direct result of these omissions, the market price of Sprint securities was artificially inflated during the Class Period. Moreover, plaintiffs allege that the market price of Sprint securities declined dramatically upon the public disclosure of the facts that defendants had failed to disclose during the Class Period.

## II. Standard Governing Motion to Dismiss Pursuant to Rule 12(b)(6)

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claims which would entitle him [or her] to relief," *Poole v. County of Otero,*

---

"foregone conclusion" that the employment of Mssrs. Esrey and LeMay would be terminated. Thus, plaintiffs suggested that the final decision was, in essence, reached prior to January 2003 (though plaintiffs did not identify the precise time at which the terminations allegedly became inevitable).

6. During oral argument, plaintiffs focused less on these 6 specific nondisclosures and focused more on the fact that defendants failed to disclose that the termination of Mssrs. Esrey's and LeMay's employment was inevitable in light the problems created by the tax shelters.

271 F.3d 955, 957 (10th Cir.2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or when an issue of law is dispositive. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati,* 258 F.3d 1167, 1174 (10th Cir.2001). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with "fact-specific inquiries" such as materiality. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997) (citations omitted). Nonetheless, "courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)," or where the defendant has no duty to disclose the information allegedly omitted. *Id.* at 1118–19 (affirming district court's Rule 12(b)(6) dismissal of securities fraud case where the defendant had no duty to disclose the information allegedly omitted). Ultimately, when evaluating defendants' motions to dismiss pursuant to Rule 12(b)(6), the court must evaluate "the totality of the pleadings" to determine if plaintiffs have stated an actionable claim of securities fraud. *See Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1092 (10th Cir.2003) (citing *City of Philadelphia v.*

*Fleming Cos., Inc.,* 264 F.3d 1245, 1261–62 (10th Cir.2001)).

## III. The Sprint Defendants' Motion to Dismiss

Defendant Sprint Corporation and the individual defendants (hereinafter the "Sprint defendants") move to dismiss plaintiffs' first amended complaint in its entirety. As a threshold matter, the Sprint defendants move to dismiss all claims on the grounds that they had no duty to disclose the facts that were omitted from Sprint's Form 10–Ks, registration statement and prospectus supplement, and proxy statements. The Sprint defendants also move to dismiss plaintiffs' section 10(b) and section 14(a) claims on the grounds that the allegations contained in plaintiffs' first amended complaint do not permit a strong inference of scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and on the grounds that plaintiffs have failed to plead adequately loss causation. The Sprint defendants move to dismiss plaintiffs' Rule 14a–9 claim for the additional reason that plaintiffs fail to allege any causal connection between any transaction for which approval was sought through a proxy statement and any alleged injury. The Sprint defendants move to dismiss plaintiffs' Section 11 claim based on the affirmative defense that plaintiffs are unable to demonstrate a decline in the value of the equity units related to the alleged omissions of defendants. Finally, the Sprint defendants move to dismiss plaintiff's control person liability claim on the grounds that plaintiffs have failed adequately to allege that any of the individual defendants had the requisite control-the power to control the transactions underlying the alleged securities violations.

As explained below, the court grants the Sprint defendants' motion to dismiss in all

respects except for plaintiffs' theory that Sprint's statements concerning the long-term employment of Mssrs. Esrey and LeMay were misleading and obligated the Sprint defendants to disclose the possibility or inevitability that the employment of Mssrs. Esrey and LeMay would be terminated as a result of the tax shelters. Thus, plaintiffs' section 10(b) and section 14(a) claims survive the Sprint defendants' motion (as the court rejects at this stage defendants' arguments concerning scienter and loss causation) subject to plaintiffs filing an amended complaint consistent with this court's order. Plaintiffs' section 11 claim, however, is dismissed in its entirety against the Sprint defendants as neither the registration statement nor the prospectus supplement contain a specific statement regarding the long-term employment of Mssrs. Esrey and LeMay.

### A. *Duty to Disclose*

■ Plaintiffs' claims are based on defendants' nondisclosure of various facts rather than on any affirmative misrepresentations. Absent an independent duty to disclose, however, nondisclosure cannot serve as the basis for liability under the federal securities laws. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir.1997) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *see also In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 267 (2d Cir.1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."). Courts have recognized an independent duty to disclose in only a handful of circumstances- when disclosure is necessary to make

statements that have been made not misleading, *see Grossman*, 120 F.3d at 1125 ("if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement"); when disclosure is mandated by statute or regulation, *see, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10, 20 (1st Cir. 1990), and when disclosure is required by virtue of a fiduciary-type relationship, *see SEC v. Cochran*, 214 F.3d 1261, 1264 (10th Cir.2000) (citing *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)).

### 1. Disclosure Required When Nondisclosure Would Render Statements Misleading

■ It is well recognized that a duty to disclose arises when silence would make statements that have been made misleading or false. *See, e.g., Connett v. Justus Enterprises of Kansas, Inc.*, 68 F.3d 382, 385 (10th Cir.1995) (in order to be actionable, an omission must render *misleading* the affirmative statements actually made) (citing *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir.1993)). Plaintiffs first contend that Sprint's financial statements in general (as opposed to any specific representation made in those statements) were misleading because the Sprint defendants failed to disclose the inevitable or possible departures of Mssrs. Esrey and LeMay.[7] Plaintiffs do not contend that the figures contained in the financial statements were inaccurate but that the statements overall were misleading in any event because an investor might have looked at those statements, believed that Sprint was performing relatively well in large part due to the management of Mssrs. Esrey and LeMay

---

**7.** The financial statements at issue were included in Sprint's Form 10–K for 2000 (filed in March 2001) and Sprint's Form 10–K for 2001 (filed in March 2002).

(individuals who were perceived as "superstars" in the industry) and then decided to invest in Sprint on the assumption that Mssrs. Esrey and LeMay would continue to lead the company in the foreseeable future.[8] As plaintiffs asserted during oral argument, the Sprint defendants were required to include in these financial statements (or to correct those statements to include) the caveat that the departures of Mssrs. Esrey and LeMay was "inevitable" in light of the tax shelter situation. As asserted in their brief and as alleged in their first amended complaint, plaintiffs argue that the Sprint defendants were required to include in Sprint's financial statements the fact that the Board was "contemplating" the removal of Mssrs. Esrey and LeMay.

▮ For purposes of analyzing whether the Sprint defendants had a duty to disclose this information in Sprint's financial statements, the court need not distinguish between the theory articulated by plaintiffs during oral argument to the effect that the terminations of Mssrs. Esrey and LeMay were "inevitable" and the theory articulated by plaintiffs in their first amended complaint that the Sprint defendants were merely contemplating the terminations of Mssrs. Esrey and LeMay and that no final decision was made until January 2003. Under either theory, the court concludes that such information did not need to be disclosed in Sprint's financial statements (absent a requirement that the information be disclosed to make a specific representation in the financial

statement not misleading, as discussed below).

In that regard, at least one court has recognized the "problems with using the annual report as a catchall depository for material information not required to be disclosed elsewhere." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 n. 2 (1st Cir. 1987). As the First Circuit noted in *Roeder*,

The SEC, however, was "given complete discretion ... to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors." S.Rep. No. 792, 73d Cong., 2d Sess. 10 (1934), *quoted in Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1051 (D.C.Cir.1979). A general admonition to include 'all material information' in annual reports preempts the promulgated regulations' instructions on what information to include and, because of the threat of civil liability, it would result in all sorts of information appearing in the reports that the SEC may prefer be left out. If the SEC wanted all possibly material information to be in the annual reports, we suspect that the regulations would have been amended to require it. The utility of such a regulation would be doubtful.

*Id.* Moreover, several courts have recognized the "well settled ... principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *See In re Burlington Coat Factory Sec. Litig.*, 114

---

8. In their brief, plaintiffs also suggest that the financial statements were misleading because Sprint derived significant tax benefits from the options exercises and, thus, was able to "create the impression" that its financial performance was more stable by boosting its net asset value. Plaintiffs did not rely on or even mention this particular theory during oral argument, however. In any event, it is un-

contested that the tax benefits that Sprint derived from the options exercises were clearly disclosed in all relevant SEC filings and that the benefits were identified as such by specific line item (*e.g.*, Sprint's Form 10–K/A for 2000 includes entries reflecting the $678 million in tax benefits and is identified by the line item, "tax benefit from stock compensation"). This argument, then, is rejected.

F.3d 1410, 1432 (3d Cir.1997) (citing cases); *accord In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 513–14 (9th Cir.1991) (rejecting plaintiffs' contention that accurate reporting of past results "misled investors by implying that [the company] expected the upward first quarter trend to continue throughout the year"). Thus, plaintiffs' theory that an investor could have relied on the accurate financial statements included in the annual reports and then decided to invest in Sprint on the assumption that Mssrs. Esrey and LeMay would continue to lead the company in the foreseeable future and that such leadership would result in similar or better financial performance is untenable under the existing federal securities disclosure requirements. In short, then, the court can find no basis for requiring the Sprint defendants to disclose in their general financial statements-statements that plaintiffs concede were accurate-that Mssrs. Esrey and LeMay may or would be removed from their positions as Sprint's top two executives.

██ Having rejected plaintiffs' argument that the financial statements in general were misleading because the Sprint defendants failed to disclose the departures of Mssrs. Esrey and LeMay (regardless of whether those departures were tentative or inevitable), the court turns to plaintiffs' argument (made only during oral argument and not in plaintiffs' brief) that several specific statements in Sprint's SEC filings were misleading in light of the Sprint defendants' failure to disclose the

possible or inevitable departures of Mssrs. Esrey and LeMay. These statements fall into two categories-the first concerns the expected tenure of Mssrs. Esrey and LeMay and the second concerns the independence of Sprint's auditor, Ernst & Young. With respect to the expected tenure of Mssrs. Esrey and LeMay, plaintiffs highlight statements made in Sprint's March 15, 2001 and March 5, 2002 proxy statements and in Sprint's March 5, 2002 Form 10–K that "Sprint entered into new employment contracts with Mr. Esrey and Mr. LeMay designed to insure their long-term employment with Sprint." [9]

As articulated by plaintiffs during oral argument, these statements concerning the "long-term employment" of Mssrs. Esrey and LeMay were misleading in the absence of a disclosure that the terminations of Mssrs. Esrey and LeMay were either inevitable and a "foregone conclusion as soon as it became clear that the tax shelters were improper (as contended by plaintiffs during oral argument) or at least a distinct possibility (as contended by plaintiffs in their first amended complaint) in light of the tax shelter situation." As explained below, the court concludes that either theory (assuming plaintiffs can support with the requisite facts the theory they articulated during oral argument) is sufficient to survive defendants' motion to dismiss. Plaintiffs, however, must amend their complaint to clarify whether they intend to pursue both theories as alternatives of whether they intend to pursue one theory over the other theory.[10]

---

**9.** According to the allegations in the first amended complaint, neither the registration statement nor the prospectus supplement contained a specific statement regarding the long-term employment of Mssrs. Esrey and LeMay. While plaintiffs highlight that these filings incorporated by reference Sprint's Form 10–K for the year ending December 31, 2000 (the Form 10–K filed on March 13, 2001), it does not appear from the amended complaint that this Form 10–K contained the

"long-term employment" statement; according to the complaint, only the Form 10–K filed on March 5, 2002 contained that statement.

**10.** If plaintiffs choose to pursue the theory that the terminations were inevitable, plaintiffs should clarify in their complaint the time at which those terminations allegedly became inevitable.

According to defendants, the allegations in plaintiffs' first amended complaint that the Board was contemplating the terminations of Mssrs. Esrey and LeMay (and yet did not make a final decision until January 2003) cannot withstand a motion to dismiss because a company has no duty to disclose "uncertain" or "contingent" plans. In other words, defendants contend that they had no duty to disclose the departures of Mssrs. Esrey and LeMay until the final decision was made to terminate their employment-a decision that, according to the allegations in the first amended complaint, was not made until January 2003. Defendants refer the court to several cases in support of their argument that tentative or uncertain plans need not be disclosed. *See, e.g., Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244–45 (4th Cir.1988); *Feder v. MacFadden Holdings, Inc.*, 698 F.Supp. 47, 51 (S.D.N.Y.1988) (no duty to disclose current or future plans that are uncertain or contingent in nature) (citing cases); *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1491 (D.Del.1984) (same). None of these cases, however, involved facts sufficiently analogous to those involved here that the cases might be particularly persuasive and none involved a situation where the company had made an affirmative statement that was arguably untrue at the time it was made in light of other nondisclosed, albeit contingent, plans. *See, e.g., Taylor*, 857 F.2d at 244 (no duty to disclose preliminary merger discussions in part because company had made no statement denying the possibility of a merger); *MacFadden Holdings*, 698 F.Supp. at 51 (no duty to disclose intent to make a second tender offer; no allegation that company had denied intent to do so).[11]

Ultimately, in light of plaintiffs' allegations that the Sprint defendants chose to speak on the issue of Mssrs. Esrey's and LeMay's "long-term employment" and suggested that such long-term employment was a specific goal that the company intended to pursue, the court cannot conclude that plaintiffs will be unable to prove a set of facts that may give rise to a duty on the part of the Sprint defendants to disclose the possibility (a possibility that was at least under serious consideration and, thus, was more than merely speculative; according to plaintiffs, either E & Y was going to be fired, or Mssrs. Esrey and LeMay were going to be fired) that the employment of Mssrs. Esrey and LeMay would be terminated as a result of the tax shelters. Similarly, the court cannot conclude that plaintiffs will be unable to

11. During oral argument, defendants relied to a great extent on *Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir.1999) for their contention that there is no duty to disclose boardroom unrest even if that unrest eventually leads to the CEO's departure. In *Cooperman*, the boardroom unrest occurred over the strategic direction the company should take and the CEO of the company disagreed with the majority of the Board of Directors on that issue. The plaintiffs in *Cooperman* alleged that various statements made in the registration statement and prospectus were misleading because they failed to disclose this disagreement (a disagreement which eventually led to the CEO's resignation). The First Circuit held that there was no duty to disclose the disagreement because the specific statements contained in the registration statement and prospectus were "complete and accurate"-they represented the current business plan that was supported by a majority of the board. *See id.* at 51. Thus, according to the court, the failure to disclose that a distinct minority of a multi-member board opposed that strategy did not render the statements misleading. *Cooperman*, then, is easily distinguished from the facts here because, as will be explained in the text, there is at least an argument that the statements made by the Sprint defendants concerning the "long-term employment" of Mssrs. Esrey and LeMay were not "complete and accurate" in light of the fact that the Board was contemplating terminating the employment of Mssrs. Esrey and LeMay.

prove a set of facts that may give rise to a duty on the part of the Sprint defendants to disclose the inevitability (to the extent plaintiffs choose to rely on this theory) that the employment of Mssrs. Esrey and LeMay would be terminated.

In reaching this conclusion, the court is guided by the Second Circuit's decision in *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir.1993). In *Time Warner*, the company, saddled with over $10 billion in debt as a result of a recent merger, made several public statements about its efforts to find "strategic partners" who would infuse billions of dollars of capital into the company. *See id.* at 262. During the same period of time that the company was making these statements (and other statements concerning the status of ongoing strategic partnership discussions), the company was also considering (and ultimately chose) an alternative method of raising capital-a new stock offering that substantially diluted the rights of the existing shareholders. *See id.* The plaintiffs filed a section 10(b) claim against the company based, among other things, on the company's failure to disclose that it was considering an alternative method of raising capital. *See id.*

The district court concluded that the statements concerning the search for strategic partnerships were accurate when made and that subsequent events did not obligate Time Warner to correct or update those statements. *See id.* at 263. On appeal, the Second Circuit reversed the district court's decision. Specifically, the court held that "when a corporation is pursuing the specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Id.* at 268. As further explained by the Second Circuit:

Time Warner's public statements could have been understood by reasonable investors to mean that the company hoped to solve the entire debt problem through strategic alliances. Having publicly hyped strategic alliances, Time Warner may have come under a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light.

*Id.*

Here, plaintiffs have alleged not just that Sprint was considering an alternative at the time it made statements touting the long-term employment of Mssrs. Esrey and LeMay but that Sprint was considering a mutually exclusive alternative or was faced with an inevitable mutually exclusive alternative-the termination of the employment of Mssrs. Esrey and LeMay. In other words, according to plaintiffs, defendants failed to disclose information that completely negated the statements made by Sprint concerning the long-term employment of its top two executives. In that respect, then, this case presents an easier question regarding the duty of disclosure than the *Time Warner* case, as the distinct possibility or inevitability that Mssrs. Esrey and LeMay would be terminated obviously casts a different light on Sprint's statements concerning their efforts to insure the long-term employment of the executives. *See id.* ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements.").

The court, then, denies the Sprint defendants' motion to dismiss to the extent that plaintiffs contend that the specific statements concerning the long-term employment of Mssrs. Esrey and LeMay were rendered misleading by the failure to disclose the possibility or inevitability that

the employment of Mssrs. Esrey and Le-May might well be terminated as a result of the tax shelters. While the first amended complaint references these statements, plaintiffs shall have the opportunity to amend the complaint to clarify the significance of the statements in relation to the particular omissions alleged.[12] While defendants' counsel articulated several interesting counterpoints during oral argument concerning the statements referencing the "long-term employment" of Mssrs. Esrey and Lemay (*e.g.*, the employment contracts offered to Mssrs. Esrey and LeMay were only two-year contracts; the removal of Mssrs. Esrey and LeMay was not inevitable) and defendants can challenge plaintiffs' allegations by appropriate motion, the court simply cannot say at this juncture that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief.

■ The court turns then, to the second type of statements made by the Sprint defendants that plaintiffs contend were misleading in light of the Sprint defen-

dants' failure to disclose that the employment of Mssrs. Esrey and LeMay would, in all likelihood, be terminated as a result of the tax shelters. In that regard, plaintiffs highlight statements made in Sprint's Form 10–K for 2000 and Sprint's Form 10–K for 2001 that

> The financial statements included in this document have been audited by Ernst & Young, LLP, independent auditors. Their audits were conducted using auditing standards generally accepted in the United States and their reports are included herein.

Similarly, in Sprint's August 7, 2001 prospectus supplement, Sprint stated that "Ernst & Young LLP, our independent auditors, have audited Sprint Corporation's consolidated financial statements ... which are incorporated by reference in this prospectus." As urged by plaintiffs during oral argument, these statements are false and misleading because the statements represented that Ernst & Young was independent when, in fact, Ernst & Young was not independent due to the conflicts of interest created by the tax shelter situation.[13] According to plaintiffs, the state-

---

12. In their briefing, plaintiffs briefly alluded to another statement made by Sprint concerning Mr. Esrey's employment with Sprint. In that regard, plaintiffs highlighted a November 12, 2002 Wall Street Journal article discussing a statement released by Sprint concerning the fact that Mr. Esrey had been diagnosed with lymphoma, but that the disease was "highly treatable" and that Mr. Esrey "will continue his full day-to-day responsibilities while he undergoes chemotherapy." It is unclear whether plaintiffs intend to rely on this statement but, to the extent an argument can be made that this statement is analogous to the "long-term employment" statements discussed above, the court will permit plaintiffs to amend their complaint to include these allegations should they choose to do so.

13. During oral argument, plaintiffs highlighted several other statements concerning Ernst & Young's independence that they contend were misleading. For example, in its March 2001 and March 2002 proxy statements, Sprint stated "The Audit Committee consid-

ered whether the non-audit services rendered by Ernst & Young were compatible with maintaining Ernst & Young's independence as auditors of Sprint's financial statements." The proxy statements also contained the statement that "In addition to services Ernst & Young provided to Sprint, some Sprint executives engage Ernst & Young to provide financial planning and tax services. Sprint reimburses the executives for the fees associated with these services." Plaintiffs have not explained, however, how these particular statements are false or misleading in any way. Plaintiffs do not contend that the Audit Committee, in fact, did not consider whether the non-audit services rendered by Ernst & Young were consistent with maintaining Ernst & Young's independence. Moreover, the fact that the Audit Committee considered the issue and may have made an erroneous conclusion (as plaintiffs allege) does not indicate that the statement was false. Finally, the statement concerning Sprint executives engaging Ernst & Young to perform various services is entirely accurate and plaintiffs plead as much in

ments obligated the Sprint defendants to disclose the conflicts of interest that Ernst & Young had with Sprint, the reasons for those conflicts and the end-result of the tax shelters-the departures of Mssrs. Esrey and LeMay.

The court rejects plaintiffs' argument because the factual allegations in plaintiffs' complaint concerning Ernst & Young's conflicts of interest simply do not support the conclusion made by plaintiffs in their complaint-that Ernst & Young lacked independence with respect to their audits of Sprint's financial statements. *See Coopersmith v. Supreme Court,* 465 F.2d 993, 994 (10th Cir.1972) (in analyzing a 12(b)(6) motion, court is obligated to accept as true only well-pleaded facts and need not accept assertions of opinions or conclusions where facts do not support them). In other words, plaintiffs have not alleged sufficient facts in their complaint supporting their assertion that Sprint's statements concerning the independence of Ernst & Young were false or misleading. According to Generally Accepted Auditing Standards,[14] the basis upon which plaintiffs rely for their assertion that Ernst & Young was not independent, "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." *See* General Standard No. 2, *Generally Accepted Auditing Standards,* Statement on Auditing Standards No. 95 (AICPA, Dec. 2001). With respect to auditing financial statements, an auditor "must be without bias with respect to the client; otherwise, he would lack that impartiality necessary for the dependability of his findings. Whether the accountant is independent is something he must decide as a matter of professional judgment." 1 AICPA Professional Standards § 504.08 (AICPA/CCH Aug. 2003).

The allegations in plaintiffs' complaint do not support the conclusion that Ernst & Young lacked independence with respect to the particular assignment at issue-the auditing of Sprint's financial statements. Neither do the allegations support the conclusion that Ernst & Young maintained any bias with respect to Sprint or that Ernst & Young lacked impartiality in conducting the audits. In their complaint, plaintiffs allege that a conflict of interest arose between Ernst & Young on the one hand and Mssrs. Esrey and LeMay on the other as a result of the "illegal tax advice Ernst sold to Esrey and LeMay" that subjected Mssrs. Esrey and LeMay to personal financial ruin. *See* First Amended Comp. ¶ 12. Based on this alleged conflict between the auditor and Sprint's top two executives, plaintiffs conclude that "the interests of Esrey and LeMay conflicted directly with those of Ernst such that Ernst may have compromised a Sprint audit because of that conflict." *See id.* Other paragraphs in the complaint refer to this conflict between Ernst & Young and Mssrs. Esrey and LeMay. *See, e.g.,* First Amended Comp. ¶¶ 53, 54, 59. The only conflict alleged between Ernst & Young and Sprint, however, is found in paragraph 69 of the First Amended Complaint. There, plaintiffs explain that Ernst & Young, in its role as personal financial advisors for Mssrs. Esrey and LeMay and as the creator and seller of the tax shelters, was obligated to advocate the unwinding of the options that Mssrs. Esrey and LeMay exercised once it became clear that the tax shelters would, in all likelihood, be disallowed. Thus, E & Y found itself in the position of advocating an act (the unwinding of the options) that would be detrimental to the financial health of Sprint in that Sprint would lose

their first amended complaint. In short, the court rejects plaintiffs' attempt to use these statements as a basis for liability.

14. *See infra* note 24.

the tax deductions it had taken upon Mssrs. Esrey's and LeMay's option exercises and, thus, would have to restate its earnings and refile its tax returns to pay back taxes. Based on these conflicts of interest stemming from Ernst & young's tax shelter advice, plaintiffs conclude that Ernst & Young's independence was impaired with respect to its audit work on Sprint's financial statements.

Assuming, as the court must, the truth of the factual allegations in plaintiffs' complaint, the conflicts described therein simply do not lead to the conclusion that Ernst & Young lacked independence with respect to auditing Sprint's financial statements. Plaintiffs have not established any link between Ernst & Young's role in offering "bad tax advice" to Mssrs. Esrey and LeMay and Ernst & Young's role as the auditor of Sprint's financial statements. Stated another way, plaintiffs have not alleged facts tending to show that the specific conflict of interest arising from Ernst & Young's tax shelter advice in any way compromised Ernst & Young's ability to remain unbiased and impartial with respect to its task of auditing the financial statements (audits that plaintiffs concede were accurate in all other respects). Moreover, plaintiffs do not allege that Ernst & Young's "mental attitude" was compromised in any respect with respect to the audits (or that Sprint in any way questioned Ernst & Young's ability to perform the audit work). While it is clear that the Sprint defendants may have been upset with Ernst & Young for selling the tax shelters to Mssrs. Esrey and LeMay (and that Sprint was worried about the tension between its top two executives and its auditors), there is no basis alleged in the complaint for concluding that Ernst & Young was somehow biased with respect

to Sprint in connection with its audit work on the financial statements. For these reasons, the court rejects plaintiffs' argument that Sprint's statements regarding the independence of Ernst & Young were false or misleading.

2. Disclosure Required by Regulation or Statute

In addition to their argument that defendants were obligated to make disclosures in this case because the nondisclosures rendered affirmative statements misleading, plaintiffs also assert that several specific provisions of SEC Regulation S–K and one particular provision of Regulation 14A required disclosure by the Sprint defendants.[15] In that regard, plaintiffs contend that Item 103 of Regulation S–K, 17 C.F.R. § 229.103, which concerns the disclosure of pending or contemplated legal proceedings, required defendants to disclose that the SEC had reviewed the unwinding of the option exercises and that the IRS was investigating Mssrs. Esrey's and LeMay's use of the tax shelters. Plaintiffs also contend that Item 401(e)(1) of Regulation S–K, 17 C.F.R. § 229.401(e)(1), which concerns the disclosure of information concerning the business experience and background of a company's directors and executive officers, required defendants to disclose that Mssrs. Esrey and LeMay were not competent to serve as Sprint's two most senior executives in light of the conflicts in which the tax shelters placed them. By way of footnote, plaintiffs also contend that Item 10(b)(3)(iii) of Regulation S–K, 17 C.F.R. § 229.10(b)(3)(iii), which concerns the disclosure of information concerning the company's financial condition, required defendants to disclose the "im-

15. While plaintiffs devoted much of their brief to their argument that disclosure was required by regulation or statute, plaintiffs can-

didly conceded during oral argument that the Sprint defendants "had the better" of the argument on this issue.

pending loss" of Sprint's top two executives. Finally, plaintiffs assert that Item 9(e)(3) of Regulation 14A, 17 C.F.R. § 240.14a–101(e)(3), which concerns the disclosure of the fees billed for all non-audit services rendered by the registrant's principal accountant, including fees for tax-related services, required defendants to disclose the "separate millions of dollars of fees paid by Esrey & LeMay, individually, to Ernst for tax avoidance advice." The court addresses each of these regulations in turn.

### a. Regulation S–K, Item 103

 According to plaintiffs, Item 103 of Regulation S–K required defendants to disclose that the SEC had "reviewed the unwinding of the option exercises" and that the IRS was investigating Mssrs. Esrey's and LeMay's use of the tax shelters. Item 103 states, in its entirety, as follows:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

See 17 C.F.R. § 229.103. On its face, then, Item 103 would seem not to apply to this case, at least with respect to plaintiffs' argument that defendants should have disclosed the fact that the IRS was investigating Mssrs. Esrey and LeMay, as it is beyond dispute that Sprint is not a party and was not a party in any IRS investigation. However, the instructions to Item 103 direct the registrant to disclose "[a]ny material proceedings to which any di-

rector, officer or affiliate of the registrant ... is a party adverse to the registrant ... or has a material interest adverse to the registrant." See Instruction 4 to Item 103 of Regulation S–K, 17 C.F.R. § 229.103.

Defendants do not dispute that an IRS investigation of Mssrs. Esrey and LeMay would be a "material proceeding" for purposes of Instruction 4 to Item 103. Rather, defendants contend that Instruction 4 to Item 103 is inapplicable because plaintiffs have not identified any adversity of interests between Mssrs. Esrey and LeMay and Sprint in connection with any IRS investigation. See General Elec. Co. v. Cathcart, 980 F.2d 927, 936 (3d Cir.1992) (Instruction 4 to Item 103 only concerns the disclosure of proceedings in which an executive has an interest adverse to that of the corporation). According to defendants, the IRS investigation concerned only Mssrs. Esrey's and LeMay's personal tax liabilities and even if those liabilities eventually led to a conflict between the executives and Sprint (which Sprint disputes), the interests of Sprint and Mssrs. Esrey and LeMay were aligned for purposes of the IRS investigation in that Sprint had no reason to want its executives' "personal investment strategies" to fail or to want its executives to face such a significant tax liability that it would force those executives into personal financial ruin. The court agrees with defendants that plaintiffs have failed to allege any adversity of interests between Sprint and Mssrs. Esrey and LeMay in connection with any IRS investigation of Mssrs. Esrey and LeMay. In fact, even under plaintiffs' theory of the case, Sprint was concerned that if the IRS determined that Ernst & Young had sold an "illegal" tax shelter to Mssrs. Esrey and LeMay, then the SEC would begin investigating Ernst & Young's audit work with respect to Sprint-an investigation that, according to

plaintiffs, Sprint clearly would want to avoid. In other words, even plaintiffs contend that it was in Sprint's best interests to have the tax shelters declared valid.

With respect to plaintiffs' argument that Item 103 required disclosure that the SEC was reviewing the unwinding of the option exercises, the court finds no support for such an assertion in either the case law or the language of Item 103 itself. According to the allegations in plaintiffs' first amended complaint, Sprint voluntarily sought guidance from the SEC in connection with its consideration of whether it could or should unwind the option exercises. It is difficult to see how this action on the part of Sprint constitutes a "legal proceeding" before the SEC. In the absence of any persuasive argument from plaintiffs on this issue, the court cannot conclude that Item 103 required defendants to disclose the fact that the SEC had considered whether Sprint could unwind the option exercises.

### b. Regulation S–K, Item 401(e)(1)

■ Plaintiffs contend that Item 401(e)(1) required defendants to disclose "information relating to the level of [an officer's] professional competence" and that plaintiffs' allegations "clearly implicate the professional competence" of Mssrs. Esrey and LeMay in that the "failed tax shelters placed them in such conflict that they were unfit to serve as Sprint's most senior executives." A full reading of Item 401(e)(1), however, makes clear that the duty to disclose information about an executive's "professional competence" extends only to those executives who have been employed by the company for less than five years and thus the excerpted language, on its face, does not apply to Mssrs. Esrey and LeMay. Moreover, the regulation does not even seem to contemplate the type of disclosure urged by plaintiffs here; rather, the regulation requires disclosure of information concerning the "business experience" and "background" of the company's executive officers, including the officer's principal occupations during the past five years and the nature of the responsibility undertaken by the officer in prior positions. Nothing in the language of the regulation suggests that defendants were required to disclose information about the financial affairs of Mssrs. Esrey and LeMay. For these reasons, the court discerns no duty to disclose on the part of defendants based on Item 401(e)(1).

### c. Regulation S–K, Item 10(b)(3)(iii)

■ According to plaintiffs, Item 10(b)(3)(iii) required defendants to disclose the possibility that Mssrs. Esrey and LeMay would be forced to resign their positions with Sprint because such information directly related to Sprint's financial condition. While it is true that Item 10(b)(3)(iii) requires disclosure of "material facts, both favorable and unfavorable, regarding [a registrant's] financial condition," the plain language of the regulation makes clear that it applies only "with respect to previously issued projections." See 17 C.F.R. § 229.10(b)(3)(iii) ("With respect to previously issued projections, registrants are reminded of their responsibility to make full and prompt disclosure of material facts, both favorable and unfavorable, regarding their financial condition."). In other words, a registrant is required to make disclosures in those circumstances where a failure to disclose would render its previously issued projections misleading. As plaintiffs have not identified any previously issued projections made by defendants concerning Sprint's financial condition, much less any projections that might be undermined by defendants' failure to disclose the facts set forth in the first amended complaint, the court cannot conclude that Item 10(b)(3)(iii) required any particular disclosure in this case.

*d. Regulation 14A, Item 9(e)(3)* [16]

■ Finally, plaintiffs maintain that Item 9(e)(3) of Regulation 14A required defendants to disclose in Sprint's March 2001 and March 2002 proxy statements that Mssrs. Esrey and LeMay had paid millions of dollars individually to Ernst & Young for "tax avoidance advice." Plaintiffs further assert that Item 9(e)(3) required disclosure of the scope of services that Ernst & Young provided to Mssrs. Esrey and LeMay and the "spiraling conflict" between Ernst & Young and Mssrs. Esrey and LeMay. This argument is rejected. Item 9(e)(3) simply does not require any disclosures concerning the non-audit fees billed to Sprint executives by Sprint's auditor-it requires disclosure only of those non-audit fees billed to Sprint. *See* 17 C.F.R. § 240.101(e)(3); *see also* Revision of the Commission's Auditor Independence Requirements, 65 Fed.Reg. 76008, 76056 (Dec. 5, 2000) (describing pertinent disclosure requirement as "focused on the aggregate amount of non-audit ... services *provided to a company* by its auditor" (emphasis added)).[17] Item 9(e)(3), then, does not require the disclosures urged by plaintiffs.

**3. Disclosure Required in Context of Fiduciary Relationship**

■ The final circumstance under which courts have recognized a duty to disclose is when "one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *See Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). While plaintiffs reference the *Chiarella* case in their brief and suggest that the requisite fiduciary relationship exists in this case, the fiduciary relationship described by the Supreme Court, however, was one that an insider has with stockholders. *See SEC v. Peters*, 978 F.2d 1162, 1166 n. 3 (10th Cir.1992). According to the Supreme Court, when the fiduciary trades the securities, a fiduciary duty may give rise to a duty to disclose relevant information that the fiduciary possesses. *See Chiarella*, 445 U.S. at 228–29, 100 S.Ct. 1108. The duty to disclose described in *Chiarella*, however, is limited to the context of insider trading and plaintiffs' first amended complaint does not allege insider trading. *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987) (plaintiffs' complaint did not allege facts demonstrating duty to disclose under *Chiarella* where complaint did not allege insider trading); *see also* 7 Louis Loss & Joel Seligman, *Securities Regulation* 3510–11 (3d ed.2003) (no affirmative duty to disclose unless statute or rule requires disclosure; an "insider" is trading; or a previous disclosure becomes inaccurate, incomplete or misleading).

Moreover, this court has found no case (and plaintiffs direct the court to no cases) recognizing a duty to disclose based on a general fiduciary relationship that a corporation and its directors owe shareholders. In fact, the cases that have addressed this issue have held that no duty to disclose

---

**16.** The Sprint defendants assert that plaintiffs mistakenly cite to Item 9(e)(3) when, in fact, plaintiffs intend to rely on Item 9(e)(4). Paragraph (e) of Item 9 was revised effective May 6, 2003 and subsection (e)(4) in the revised text is the subsection upon which plaintiffs rely. However, the pertinent regulation prior to May 2003 and during the time period relevant to plaintiffs' complaint is subsection (e)(3).

**17.** Because the disclosure requirement is focused on services provided to the company (here, Sprint), the allegations in plaintiffs' first amended complaint that Sprint required its senior executives to use Ernst & Young to prepare their personal tax returns and would reimburse those executives for the cost of the work performed by Ernst & Young do not change the court's conclusion that Item 9(e)(3) is inapplicable.

arises from the general fiduciary relationship that exists between a corporation and its shareholders; insider trading or some other collateral activity must be present. *See, e.g., Roeder,* 814 F.2d at 27 (corporation has no affirmative duty to disclose absent insider trading, statute or regulation requiring disclosure, or misleading prior disclosures); *Blanchard v. Edgemark Fin. Corp.,* 2001 WL 587861, at *5 (N.D.Ill. Mar.12, 2001) (defendants were under no duty to disclose simply by virtue of general fiduciary relationship that exists between corporations and its shareholders; duty to disclose would arise only if defendants acted in a manner to trigger a duty, such as using the information to engage in insider trading); *Holstein v. Armstrong,* 751 F.Supp. 746, 748 (N.D.Ill.1990) (same).

In sum, plaintiffs have not alleged facts in their first amended complaint showing that defendants had a duty to disclose information to plaintiffs based on any fiduciary relationship that might have existed between defendants and plaintiffs.

### 4. Summary

In sum, the court grants the Sprint defendants' motion to dismiss in all respects except for plaintiffs' theory that Sprint's statements concerning the long-term employment of Mssrs. Esrey and LeMay were misleading and obligated the Sprint defendants to disclose the possibility or inevitability that the employment of Mssrs. Esrey and LeMay would be terminated as a result of the tax shelters. Thus, plaintiffs' section 10(b) and section 14(a) claims survive the Sprint defendants' motion (as the documents pertinent to those claims contain statements referencing Mssrs. Esrey's and LeMay's long-term employment) subject to plaintiffs filing an amended complaint as described above. Plaintiffs' section 11 claim, however, is dismissed in its entirety against the Sprint defendants as neither the registration statement nor the prospectus supplement contain a specific statement regarding the long-term employment of Mssrs. Esrey and LeMay. *See supra* note 9.

### B. Scienter

The Sprint defendants also move to dismiss plaintiffs' section 10(b) and section 14(a) claims on the grounds that plaintiffs have failed to allege facts permitting a strong inference that defendants failed to disclose material facts with the requisite state of mind as required by the Private Securities Litigation Reform Act of 1995. To satisfy the pleading requirements of the Reform Act, "plaintiffs must (1) specify all allegedly misleading statements and the reasons why those statements are misleading, and (2) state with particularity facts giving rise to a strong inference that defendants made those statements with the requisite scienter." *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1188 (10th Cir.2003) (citing 15 U.S.C. § 78u–4(b)). The appropriate level of scienter for a primary violation of section 10(b) is "a mental state embracing intent to deceive, manipulate, or defraud, which includes recklessness." *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1259–60 (10th Cir.2001) (citations omitted). Thus, to establish scienter in a section 10(b) securities fraud case alleging nondisclosure of potentially material facts, plaintiffs "must demonstrate: (1) the defendant[s] knew of the potentially material fact, and (2) the defendant[s] knew that failure to reveal the potentially material fact would likely mislead investors." *Pirraglia,* 339 F.3d at 1191 (quoting *Fleming,* 264 F.3d at 1261). The requirement of knowledge in this context "may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely

mislead investors." *Fleming*, 264 F.3d at 1261.[18]

 In their motion to dismiss, the Sprint defendants contend that plaintiffs simply allege no facts in their complaint tending to show that the Sprint defendants knew that their nondisclosures of the events described in the complaint would likely mislead investors. In response to the Sprint defendants' arguments, plaintiffs focus almost entirely on their allegations showing that the Sprint defendants knew of the potentially material facts. As defendants point out, however, it is insufficient to plead only the first of the two factors set forth in *Fleming* (and restated in *Pirraglia*)-that is, it is not enough to plead that the defendants knew of the facts:

> [A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud.

*Fleming*, 264 F.3d at 1260. While plaintiffs do argue that the Sprint defendants had "motive and opportunity" to conceal these facts from the investing public, the Tenth Circuit has held that such allegations, standing alone, are typically insufficient in themselves to establish a "strong inference" of scienter. *See id.* at 1262.[19]

Nonetheless, because plaintiffs' theory of the case became considerably more clear and focused during oral argument (at which time plaintiffs tied the nondisclosure of the inevitable or possible departures of Mssrs. Esrey and LeMay to the specific statements concerning Sprint's efforts to secure the long-term employment of those individuals), and because the parties' briefs were written at a time before plaintiffs had clearly articulated their theory, much of the briefing from both parties on the issue of scienter is no longer relevant or helpful to the court's analysis of the sole theory remaining in the case-that Sprint's statements regarding the long-term employment of Mssrs. Esrey and LeMay were false and misleading by virtue of Sprint's failure to disclose the inevitable or possible departures of Mssrs. Esrey and LeMay. Thus, because the court is permitting plaintiffs an opportunity to amend their complaint to more clearly allege what was alleged during oral argument, the court will similarly permit plaintiffs to amend their complaint to supplement their allegations of scienter with particular focus on whether the Sprint defendants, when making the statements concerning the long-term employment of Mssrs. Esrey and LeMay, knew that those statements would likely mislead investors in the absence of a disclosure concerning the inevitable and/or

---

18. Defendants concede that the applicable state of mind with respect to plaintiffs' section 14(a) claim is negligence rather than fraud or recklessness. *See* 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* 428–29 (4th ed.2002) (negligence is sufficient to state a claim under the proxy rule's antifraud provisions) (collecting cases). While defendants argue in their brief that plaintiffs have also failed to allege any facts showing negligence on the part of defendants, plaintiffs, as will be explained, will be permitted an opportunity to amend their complaint. After that time, if defendants still believe that dismissal of plaintiffs' section 14(a) claim is appropriate for failure to allege facts supporting the conclusion that defendants acted negligently, then defendants may file another motion to dismiss on this basis.

19. That is not to say that the court would simply ignore allegations of motive and opportunity, for such allegations "may be important" in assessing whether the "totality of the pleadings" permit a "strong inference of fraudulent intent." *See Fleming*, 264 F.3d at 1262.

possible departures of Mssrs. Esrey and LeMay. Upon reviewing plaintiffs' amended complaint, defendants may file another motion to dismiss challenging plaintiffs' allegations of scienter if defendants believe that dismissal on these grounds is warranted.

## C. Loss Causation

The Sprint defendants also move to dismiss plaintiffs' section 10(b) and section 14(a) claims on the grounds that plaintiffs have failed to plead adequately loss causation. Specifically, defendants assert that plaintiffs cannot show that the value of Sprint stock declined after the pertinent disclosures and that plaintiffs' allegations of a decline in stock price are demonstrably false. In that regard, defendants' evidence shows that the stock price either stayed the same or increased in the week immediately following the disclosure that Mssrs. Esrey and LeMay would be stepping down and in the week immediately following the disclosures that Mssrs. Esrey and LeMay had entered into tax shelters and that the IRS might question the viability of those shelters.[20] In their brief, plaintiffs' initial response is that they are not required to allege a decline in stock value following the disclosures; they simply have to allege that the price at the time of purchase was overstated and then identify the cause of the overstatement. In support of their argument, plaintiffs rely on a standard of loss causation set forth by the Ninth Circuit. Plaintiffs concede in their brief, however, that the majority of circuits have required that a plaintiff plead that the stock price fell and that it fell in response to the revelation of the facts that were previously omitted. See D.E. & J Limited Partnership v. Conaway, 284 F.Supp.2d 719, 748–49 & n. 24 (E.D.Mich.2003) (collecting cases).

■ In any event, plaintiffs contend that even if we apply the more rigorous standard (allegations that the stock price declined upon disclosures), they have nonetheless satisfied this standard by alleging that the price of Sprint FON stock fell in direct response to the revelation of the fact that Mssrs. Esrey and LeMay would be stepping down. According to plaintiffs, FON stock opened on January 30, 2003 at $11.98 and closed that day at $11.50, a decline of 4 percent; they further assert that PCS stock opened on January 30, 2003 at $3.80 and closed that day at $3.63, a decline of 4.5 percent. Defendants, however, highlight that the price of the stock actually increased over the course of the week-long period beginning January 30, 2003. Plaintiffs also suggest that the news of Mssrs. Esrey and LeMay stepping down surfaced on the morning of January 29, 2003 (as opposed to January 30, 2003 when the Wall Street Journal ran an article about the subject)-and that the Kansas City Business Journal reported that FON stock was down almost 14 percent within 2 hours after the news surfaced and PCS stock was down more than 9 percent within 2 hours after the news surfaced.

The court concludes that, for purposes of defendants' motion to dismiss, plaintiffs have alleged a sufficient stock price decline immediately following the announcement that Mssrs. Esrey and LeMay would be leaving Sprint. The court, then, denies defendants' motion to dismiss plaintiffs' section 10(b) and section 14(a) claims on this basis. Plaintiffs' allegations concerning the January 29, 2003 public airing of the news and the related Kansas City Business Journal article, however, do not appear in plaintiffs' first amended complaint and, thus, to the extent plaintiffs seek to rely on the January 29, 2003 date

20. The parties apparently agree that the court may take judicial notice of the pertinent stock prices and, thus, the court does so without further analysis of the issue.

for purposes of measuring the decline in stock value, plaintiffs should amend their complaint to incorporate these allegations.

■ Finally, the Sprint defendants assert that plaintiffs' section 14(a) claim fails for the additional reason that plaintiffs have not alleged a causal connection between any transaction for which approval was sought through a proxy statement and any alleged injury. The only transactions for which authorization was sought through the challenged 2001 and 2002 proxy statements were (1) the approval of the appointment of Ernst & Young as Sprint's independent auditor; and (2) the election of Mssrs. Esrey and LeMay as directors. According to defendants, plaintiffs fail to identify any loss stemming from either one of these transactions. In response, plaintiffs clarify that their section 14(a) claim centers around the undisclosed

conflict of interest that Ernst & Young had as opposed to the election of Mssrs. Esrey and LeMay as directors.

According to plaintiffs, there is clearly a connection between the appointment of Ernst & Young and plaintiffs' injury in that the stock price declined after the conflict of interest was revealed. Moreover, as plaintiffs explained more thoroughly during oral argument, had Sprint appointed an auditor other than Ernst & Young for 2001 or 2002, that auditor might have encouraged Sprint to disclose the fact that the continued employment of its two top executives was in jeopardy in light of the precarious financial condition they faced as a result of the questionable tax shelters. In sum, the court concludes that plaintiffs adequately have pled a loss stemming from the appointment of Ernst & Young as Sprint's auditor.[21]

---

21. The Sprint defendants also assert that plaintiffs' section 11 claim should be dismissed due to plaintiffs' inability to demonstrate a decline related to the alleged omissions of defendants. While the court need not address this argument in light of its conclusion that plaintiffs' section 11 claim should be dismissed on other grounds, the court notes that it would reject this argument. Although loss causation is not an element of a section 11 claim, the absence of loss causation is an affirmative defense to a section 11 claim. *See* 15 U.S.C. § 77k(e). According to defendants, plaintiffs' section 11 claim is based on the damages allegedly sustained through purchase of "equity units" pursuant to an August 7, 2001 registration statement but plaintiffs' first amended complaint contains no allegation linking any purported omission to a decline in the value of the equity units following the allegedly corrective disclosures on January 30 and February 5, 2003. Defendants further assert that plaintiffs cannot establish such a link because no decline in value occurred. According to defendants, the value increased over the course of the weeks following the disclosures.

As plaintiffs highlight in their response, defendants may not raise the affirmative defense

in the context of a motion to dismiss because the defense does not appear plainly on the face of the complaint itself. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 348–49 (1990) (affirmative defense clearly must appear on the face of the pleading in order for complaint to be subject to dismissal under 12(b)(6)); *accord Miller v. Shell Oil Co.,* 345 F.2d 891, 893 (10th Cir.1965) (an affirmative defense may be raised in a motion to dismiss for the failure to state a claim "[i]f the defense appears plainly on the face of the complaint itself"). In that regard, the allegations in plaintiffs' first amended complaint in no way suggest the availability of the affirmative defense urged by defendants. Moreover, defendants would not be entitled to dismissal on the basis of the affirmative defense in any event. While defendants look at the course of a week or more to show that the value of the equity units increased, plaintiffs' evidence shows that, in the most immediate time frame, the value decreased during the relevant time period. In that regard, plaintiffs allege, using the January 29, 2003 disclosure date, the value of the units decreased from a closing price of $6.85 on January 28 to a closing price of $6.19 on January 29–a 9.6 percent decrease.

### D. Controlling Person Liability

Plaintiffs assert against the individual defendants claims under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, which impose secondary liability upon persons who control persons primarily liable for violations of Section 10(b) and Rule 10b–5, and Section 11, respectively. Plaintiffs assert a section 20(a) claim against all of the individual defendants, presumably because each of those individuals signed the pertinent Form 10–Ks; plaintiffs assert a section 15 claim against only those individual defendants who signed the registration statement-Mssrs. Esrey, LeMay, Krause, Meyer, Batts, Rice, Smith and Turley and Ms. Lorimer.

To state a prima facie case of control person liability, plaintiffs must first establish a primary violation of the securities laws. *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270 (10th Cir.2001). As the court has concluded that, for purposes of defendants' 12(b)(6) motion, plaintiffs have stated claims under section 10(b) (assuming plaintiffs amend their complaint consistent with this order), plaintiffs have satisfied the first prong of their section 20(a) claim for control person liability. *See Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir.2003) (holding that plaintiffs satisfied first requirement in pleading a claim of control person liability where the court had already concluded that plaintiffs had successfully pled primary violations of the securities laws). However, because the court has concluded that plaintiffs cannot state a primary violation of section 11, then the court must dismiss plaintiffs' section 15 claims. *See Fleming*, 264 F.3d at 1270–71.

The second and final element of the prima facie case requires that plaintiffs plead facts from which it can reasonably be inferred that the individual defendants had "control" over the primary violator. *See id.* at 1107–08. To make this showing, plaintiffs must point to facts which indicate that the individual defendants had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* at 1108 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998)). According to the Sprint defendants, dismissal of plaintiffs' section 20(a) control person liability claims is appropriate (at least with respect to the individual defendants other than Mssrs. Esrey and LeMay) because plaintiffs cannot establish the second prong of their prima facie case.

According to defendants, the first amended complaint contains no allegations that the individual defendants had the power to control the disclosures Sprint made in its SEC filings rather, the allegations establish nothing more than the fact that the individual defendants (again aside from Mssrs. Esrey and LeMay) are directors or officers of Sprint. As the Tenth Circuit has recognized, "[t]he assertion that an individual is a member of the corporation's board of directors without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act." *See id.*

The court begins with the four individual defendants who were more than mere members of Sprint's board of directors. Clearly, Mssrs. Esrey and LeMay would not be entitled to dismissal of the control person liability claims and it appears that defendants concede this point at the outset. *See id.* (chairman, president and CEO clearly possesses requisite con-

trol for control person liability and would have possessed the ultimate management authority of the corporation on a daily basis). According to the allegations in the first amended complaint, defendant Arthur Krause was Sprint's Chief Financial Officer during the relevant time period and defendant J.P. Meyer was Sprint's Controller during the relevant time period. In those cases in which the securities fraud claims specifically relate to official reports of the company's financial performance, the Tenth Circuit has held that it is reasonable to infer that such officers had at least indirect control over financial reporting and that such officers were not entitled to dismissal of control person liability claims. *See id.* at 1109 (chief financial officer possesses requisite control where actionable claims of securities fraud specifically relate to official reports of the company's financial performance and, thus, it was reasonable to infer that CFO had at least indirect control over financial reporting). While plaintiffs' highlight specific statements made in Sprint's SEC filings that were allegedly misleading, none of these statements relates to the financial performance of Sprint. In other words, plaintiffs do not dispute that the financial reports themselves were accurate in all respects. Unlike the circumstances present in *Kinder–Morgan*, then, where the claims related to official reports of the company's financial performance, there is no reason here to infer that Mssrs. Krause and Meyer had any control over statements made in the SEC filings that had nothing to do with financial reporting. Thus, the mere fact that Mssrs. Krause and Meyer held the positions of CFO and Controller is "not likely ... enough satisfactorily to allege control." *See id.* (in absence of securities fraud claims relating specifically to official reports of financial performance, mere fact that individual defendant was the company's CFO would not likely be enough to allege control).

■ The remaining individual defendants are all (or were at the relevant time) members of Sprint's board of directors who also signed Sprint's Form 10–K for the fiscal year ending December 31, 2000 and Sprint's Form 10–K for the fiscal year ending December 31, 2001. Mssrs. Krause and Meyer also signed Sprint's Form 10–Ks. According to plaintiffs, the mere fact that these defendants signed the pertinent reports is sufficient to allege the requisite control. Defendants disagree.

It appears that the majority of district courts that have addressed this issue have held that an allegation that a board member signed an SEC filing that contains a misleading or fraudulent statement can raise a sufficient inference of control because it comports "with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *See In re Livent, Inc. Noteholders Securities Litig.*, 151 F.Supp.2d 371, 437 (S.D.N.Y.2001) (quoting *Jacobs v. Coopers & Lybrand, LLP*, 1999 WL 101772, at *17 (S.D.N.Y. Mar.1, 1999)); *accord Tracinda Corp. v. DaimlerChrysler AG*, 197 F.Supp.2d 42, 72 (D.Del.2002) (plaintiffs sufficiently pled elements of controlling persons claim to withstand 12(b)(6) dismissal where plaintiffs alleged that directors signed pertinent SEC filings); *In re Tel–Save Sec. Litig.*, 1999 WL 999427, *6–7 (E.D.Pa.Oct.19, 1999). As the district court explained in *In re Livent*,

An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation, at least insofar as the "management and policies" referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. 17 C.F.R. § 240.12b–2. For, by placing liability on

directors and other controlling persons the statute contemplates not only giving plaintiffs an additional source of redress to recover losses caused by corporate misrepresentations. It also seeks indirectly to foster accountability by imposing a penalty on those who are in a position to monitor the truthfulness of corporate public representations and establish standards to that end, but fail to do so, to the detriment of the corporation's investors. 151 F.Supp.2d at 437. The court finds this reasoning persuasive and, at this early stage, cannot conclude that plaintiffs can prove no set of facts in support of their section 20(a) claims of control person liability. Defendants' motion to dismiss these claims, then, is denied.

## IV. Defendant Ernst & Young's Motion to Dismiss

Defendant Ernst & Young (hereinafter E & Y) also moves to dismiss plaintiffs' first amended complaint in its entirety. Specifically, E & Y moves to dismiss plaintiffs' section 10(b) and section 11 claims because plaintiffs concede that the financial statements audited by E & Y conform in all respects with GAAP and, in any event, E & Y's purported misstatement that it complied with GAAS in conducting the audit was not material. E & Y also moves to dismiss plaintiffs' section 10(b) claim on the grounds that the allegations contained in plaintiffs' first amended complaint do not permit a strong inference of scienter as required by the PSLRA and on the grounds that plaintiffs have failed to plead adequately loss causation. E & Y

moves to dismiss plaintiffs' section 14(a) claim on the grounds that E & Y did not make any statement or representation in the proxy statement and did not have a duty to make any disclosures in the proxy statements. As explained below, the court grants E & Y's motion to dismiss in its entirety.

### A. Plaintiffs' Section 10(b) and Section 11 Claims Against E & Y

■■■ In order for section 10(b) liability to attach to an accountant or other outside professional such as E & Y, "they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors." See Anixter v. Home–Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir.1996). In other words, plaintiffs must point to a representation, either by statement or omission, made by E & Y; reliance only on representations made by the Sprint defendants cannot form the basis of liability against E & Y. See id. at 1225.[22] Accordingly plaintiffs' section 10(b) and section 11 claims against defendant E & Y are based on allegedly misleading statements made by E & Y in Sprint's Form 10–K for 2000 (filed in March 2001) and Sprint's Form 10–K for 2001 (filed in March 2002).[23] The only statements made by E & Y in connection with Sprint's Form 10–Ks are found in the standard three-paragraph audit report of E & Y concerning the audited financial statements that are included in Sprint's Form 10–Ks. In summary, the first paragraph of the audit report states that E & Y audited the year-end financial state-

---

**22.** Neither in their brief nor during oral argument did plaintiffs suggest that E & Y had a general duty to disclose any information in Sprint's financial statements; plaintiffs' claims are focused entirely on E & Y's affirmative statements concerning its compliance with GAAS.

**23.** With respect to their section 11 claim against defendant E & Y, plaintiffs do not contend that E & Y made any separate statements in the pertinent registration statement or prospectus supplement. The registration statement and prospectus supplement, however, specifically incorporate by reference Sprint's Form 10–Ks, including E & Y's reports concerning those financial statements.

ments; the second paragraph states that E & Y conducted the audit in accordance with generally accepted auditing standards (GAAS); and the third paragraph states that, in E & Y's opinion, the financial statements present fairly in all material respects Sprint's financial condition in conformity with generally accepted accounting principles (GAAP).[24]

Plaintiffs do not challenge any statements made by E & Y in the first and third paragraphs of the audit report. That is, they do not dispute that E & Y audited the financial statements and they do not dispute that the financial statements conform with GAAP (indeed, the financial statements for year-end 2001 reflect that Sprint suffered from three consecutive years of significant losses and plaintiffs concede that the numbers in the financial statements are accurate). Rather, plaintiffs assert only that E & Y's statement in the second paragraph, that it conducted the audits in accordance with GAAS, was false and misleading because, in fact, the audits were not performed in accordance with GAAS. According to plaintiffs, GAAS requires that an auditor be independent in fact and in appearance and free from conflicts of interest and, plaintiffs urge, E & Y was neither independent nor free from conflicts of interest at the time it audited Sprint's financial statements.

■ In support of its motion to dismiss, E & Y first asserts that plaintiffs' section 10(b) and section 11 claims fail as a matter of law because plaintiffs admit the accuracy of Sprint's financial statements and admit that the audited financial statements complied with GAAP in all respects.

In other words, plaintiffs concede that the numbers contained in the audited statements are accurate. According to E & Y, plaintiffs must allege that the financial statements were materially and fraudulently misstated in violation of GAAP in order to state a claim against E & Y for securities fraud. In the same vein, E & Y contends that it has been unable to find any case in which a court permitted a section 10(b) claim to go forward against an auditor where the plaintiffs concede that the audited financial statements complied with GAAP. This court, however, has been unable to find any case in which a court has stated that, as a matter of law, plaintiffs asserting a securities fraud claim against an auditor must allege a violation of GAAP in order to state a claim against that auditor. In fact, courts have recognized that compliance with GAAP does not necessarily immunize an accountant from liability for securities fraud. *See, e.g., Monroe v. Hughes,* 31 F.3d 772, 774 (9th Cir.1994) (compliance with GAAP was not sufficient to immunize accountant from liability under section 11 if that accountant chose not to disclose or a registration statement a known material fact); *Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153, 1160 (3d Cir.1989) (upholding jury verdict against accountant on section 10(b) claim where jury concluded that accountant had not complied with GAAS in conducting audit but that accountant had complied with GAAP). The court concludes, then, that plaintiffs' admission that the audited financial statements in this case complied with GAAP is not necessarily fatal to their claims against E & Y.

**24.** Generally accepted auditing standards (GAAS) are the standards prescribed by the Auditing Standards Board of the American Institute of Certified Public Accountants (AICPA) for the conduct of auditors in the performance of an examination. *See Jacobs v. Coopers & Lybrand, L.L.P.,* 1999 WL 101772, at *2 n. 3 (S.D.N.Y. Mar.1, 1999). Generally accepted accounting principles (GAAP) are the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the AICPA and establish guidelines for measuring, recording, and classifying the transactions of a business entity. *Id.*

■ That having been said, however, the court nonetheless concludes that dismissal of plaintiffs' section 10(b) claim (and, thus, plaintiffs' section 11 claim [25]) is appropriate because, as explained above in connection with similar statements made by the Sprint defendants, *see* discussion *supra* at pp. 1133–36, the allegations in plaintiffs' complaint simply do not support the conclusion that E & Y lacked independence with respect to its audits of Sprint's financial statements. Stated another way, plaintiffs have not alleged facts sufficient to support their assertion that the statements made by E & Y were false or misleading in any respect.

Moreover, even assuming that E & Y's statement that it conducted the audits in accordance with GAAS was untrue because, in fact, E & Y lacked independence with respect to the audits, the court would still grant E & Y's motion to dismiss the section 10(b) and section 11 claims on the grounds that such a misstatement is simply not material. *See Anixter*, 77 F.3d at 1225 (to establish a primary violation of section 10(b), a plaintiff must prove that the defendant made an untrue statement of material fact or failed to state a material fact). Significantly, plaintiffs concede that E & Y's alleged lack of independence had no effect on the audits-it is undisputed that the financial statements were accurate in all respects. Thus, even if E & Y had refrained from auditing the financial statements and another auditor had conducted the audits, the financial statements that Sprint's investors received would have been identical to the ones they actually received. In such circumstances, it is difficult to imagine how a reasonable investor could conclude that E & Y's purported misstatement "significantly altered the total mix of information available;" thus, as a matter of law, the statement is not material. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Finally, even assuming that E & Y's statement that it complied with GAAS was untrue because it lacked independence with respect to the audits, and even assuming that the misstatement was material, the court would still dismiss plaintiffs' section 10(b) claim because plaintiffs have failed adequately to allege scienter. Of course, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" and must be "coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors." *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 1261 (10th Cir.2001).[26] Although

---

**25.** Because plaintiffs' section 11 claim against E & Y is based solely on the statements contained in Sprint's Form 10–Ks (statements that were incorporated by reference into the registration statement), the court's conclusion that the statements contained in the Form 10–Ks are not actionable and that the section 10(b) claim must be dismissed mandates the conclusion that the section 11 claim be dismissed.

**26.** It is also beyond dispute that an accountant's interest in continued employment with the client (such that the accountant can continue to collect auditing fees) is insufficient to

establish scienter. *See, e.g., In re K–tel Int'l, Inc. Securities Litig.*, 300 F.3d 881, 895 (8th Cir.2002) (allegations of a desire to maintain continued employment are insufficient to establish scienter); *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127–28 (7th Cir.1990) (accountant's receipt of substantial fees for its services "not sufficient to support an inference of scienter"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 628 (E.D.Pa.1999) (allegation that accounting firm received more than $13 million in fees over 2–year period is insufficient to show motive to commit fraud). Thus, the allegations in plaintiffs' first amended complaint

most courts have concluded that recklessness can satisfy the requirement of scienter in a securities fraud action against an accountant, *see SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (collecting cases), "recklessness" in a securities fraud action against an accountant is defined as

> highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. That standard requires more than a misapplication of accounting principles. The SEC must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or "an egregious refusal to see the obvious, or to investigate the doubtful," or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* (citations and footnote omitted); *accord Fleming,* 264 F.3d at 1265 (standard for recklessness in securities context is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.").

There is no basis to conclude from plaintiffs' first amended complaint that E & Y knew of any potential negative impact of its statement that it complied with GAAS or that any such impact was "so obvious" that E & Y must have been aware of it. In fact, plaintiffs' first amended complaint is devoid of any allegations suggesting that E & Y knew or believed that it lacked independence with respect to its audit work and yet made the statement concerning its compliance with GAAS anyway. There is no allegation suggesting that E & Y knew or believed that its ability to conduct the audits was compromised in any way. Similarly, there is no basis to conclude from plaintiffs' first amended complaint that E & Y's conduct amounted to an "egregious refusal to see the obvious" (indeed, E & Y's alleged lack of independence is not obvious to the court), or that E & Y's judgment in making the statement that it complied with GAAS was such that no reasonable accountant would have made the same statement if confronted with the same facts. *See SEC v. Price Waterhouse,* 797 F.Supp. at 1240. Simply put, the court cannot conclude that plaintiffs have stated with particularity facts giving rise to a strong inference that E & Y acted with the requisite state of mind when it made the statement that its audits had been conducted in accordance with GAAS.[27]

### B. Plaintiffs' Section 14(a) Claim Against E & Y

Plaintiffs also assert a section 14(a) claim against E & Y on the grounds that Sprint's March 2001 and March 2002 proxy statements sought to reelect E & Y as Sprint's independent auditor and yet failed to disclose the "debilitating conflicts between Esrey and LeMay and Ernst stemming from Ernst's tax planning advice,

---

suggesting that E & Y failed to disclose its lack of independence in the Form 10–Ks for fear of losing the auditing, tax and consulting fees that it collected from Sprint do not salvage plaintiffs' scienter argument. *See* First Amended Comp. ¶ 41.

27. E & Y also moves to dismiss plaintiffs' section 10(b) claim on the grounds that plaintiffs have failed to establish loss causation. The court declines to address this argument as it has concluded that dismissal of this claim is appropriate on other grounds.

which in turn lead [sic] to a conflict between the Sprint Board and Esrey and LeMay." E & Y moves to dismiss this claim on the grounds that it did not make any affirmative statement in the proxy statements and, in the absence of making any statement, it had no general duty to disclose any information in the proxy statements. The motion is granted.

■ It is undisputed that E & Y did not make any statements or representations in Sprint's proxy statements. Thus, plaintiffs do not and cannot contend that E & Y had a duty to disclose information because the omissions would render misleading an affirmative statement actually made by E & Y. Moreover, plaintiffs direct the court to no statute or regulation requiring E & Y to disclose any information in Sprint's proxy statements. To the extent plaintiffs suggest that E & Y had a general duty to disclose information in the proxy statement, they direct the court to no authority supporting that suggestion and the court is aware of none. Indeed, a reading of the Tenth Circuit's decision in *Anixter v. Home–Stake Production Co.*, 77 F.3d 1215 (10th Cir.1996) suggests that no general duty exists. In *Anixter*, the Circuit, in the context of a section 10(b) case, stated that "the extent to which an accountant can be liable ... for omissions is not settled." *See id.* at 1226 n. 12. The Circuit reiterated that an accountant must have a duty to speak before he or she will be held liable in a nondisclosure case. *See id.* The Circuit then identified two situations in which an accountant "may" have a special duty to disclose-when the accountant makes affirmative statements on which he or she knows investors will rely and when the accountant audits a public company's financial statements and thereby creates a fiduciary relationship with investors. *See id.* Ultimately, the court did not address whether it would impose on accountants a duty to disclose in either of those situations, but the court's language

suggests that no duty to disclose would exist in the absence of either an affirmative statement or a fiduciary relationship created by virtue of auditing a company's financial statements. Of course, neither of those situations is applicable to plaintiffs' section 14(a) claim.

In the absence of any authority from plaintiffs suggesting that E & Y had a general duty to disclose information in Sprint's proxy statements, the court grants E & Y's motion to dismiss this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Sprint Corporation and the individual defendants' motion to dismiss (doc. # 68) is granted in part and denied in party Defendant Ernst & Young LLP's motion to dismiss (doc. # 70) is granted and plaintiffs' complaint as to defendant Ernst & Young is dismissed in its entirety.

With respect to their claims against the Sprint defendants, plaintiffs shall file an amended complaint consistent with this order no later than May 21, 2004. In amending their complaint, plaintiffs shall remove from their complaint all claims and allegations that the court has dismissed in this order and the failure to reallege such claims and allegations in accordance with this order shall not be deemed a waiver of any assertions plaintiffs may wish to make at a later date that the court's dismissal of such claims and allegations was erroneous.

The Sprint defendants shall file any motion to dismiss the second amended complaint (challenging only those allegations not previously raised by plaintiffs in the First Amended Consolidated Class Action Complaint; defendants' failure to re-challenge those allegations that the court has concluded survive defendants' motion to dismiss shall not be deemed a waiver of any assertions defendants may wish to make at a later date that the court's refusal to dismiss such allegations was errone-

ous) no later than June 21, 2004. If the Sprint defendants file a motion to dismiss, the response and reply times for such motion will be governed by the applicable local and federal rules and paragraphs 5 and 6 of the First Phase Scheduling Order will be applicable once the motion is resolved.

If the Sprint defendants do not file a motion to dismiss, they shall file an answer to plaintiffs' second amended complaint on or before June 21, 2004 and, at that time, paragraph 6 of the First Phase Scheduling Order will be applicable.

**IT IS SO ORDERED.**